**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SANDY JENSEN; ROGER JENSEN,<br><br>Plaintiffs,<br><br>vs.<br><br>CHEE YAZZIE BURNSIDES; CITY OF WILLIAMS,<br><br>Defendants. | No. CV-06-2356-PHX-GMS<br><br>**ORDER** |

Pending before the Court are Defendants' Motion for Judgment on the Pleadings (Dkt. # 72) and Defendants' Motion for Summary Judgment (Dkt. # 75), as well as the responses and replies relevant thereto (Dkt. ## 73, 74, 80, 85). For the following reasons, the Court grants Defendants' Motion for Summary Judgment and denies as moot Defendants' Motion for Judgment on the Pleadings.[1]

---

[1]Plaintiffs have requested oral argument. The request is denied because the parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

1

## BACKGROUND

2    On February 5, 2006, Roger Heath Jensen drove an ATV across private railroad

3    property and onto a public road. (Dkt. # 76 at 1; Dkt. # 81 at 2.)  In doing so, he was seen

4    by City of Williams Police Officer Chee Yazzie Burnsides. (Dkt. # 76 at 1; Dkt. # 81 at 2.)

5    Burnsides later made contact with Jensen at a local diner and questioned him about

6    trespassing on railroad property. (Dkt. # 76 at 1; Dkt. # 81 at 2.)  Burnsides learned that

7    Jensen's license was revoked and was informed by a City of Williams police dispatcher that

8    Jensen was on probation. (*See* Dkt. # 76 at 2; Dkt. # 81 at 2.)  Burnsides arrested Jensen and

9    took him to the City of Williams police station. (Dkt. # 76 at 2; Dkt. # 81 at 3.)

10    At the station, Burnsides began to process Jensen.  As Burnsides later explained,

11    Jensen "seemed not to be having trouble with being arrested.  He didn't seem like he was

12    going to give me any trouble." (Dkt. # 76 at 2; Dkt. # 81 at 3.)  Thus, Burnsides sat Jensen

13    on a bench next to him, and although Jensen's hands were cuffed, Burnsides did not cuff

14    Jensen to the bench. (Dkt. # 76 at 3; Dkt. # 81 at 4.)  Burnsides proceeded to administer

15    several intoxilyzer tests, although the parties disagree about exactly when that occurred.

16    (Dkt. # 76 at 2; Dkt. # 81 at 2-3.)  The parties also dispute how Jensen's hands became

17    positioned in front of him.  According to Burnsides, Jensen maneuvered his handcuffs from

18    behind his back to the front. (Dkt. # 76 at 3.)  Plaintiffs assert that Jensen's hands were

19    handcuffed in front by Burnsides. (Dkt. # 81 at 4.)

20    Either way, it is undisputed that Jensen attacked Burnsides without provocation.[2]

21    (Dkt. # 76 at 3; Dkt. # 81 at 4-5.)  Jensen knocked Burnsides to the floor when he was

22    looking away, and Burnsides was semi-conscious until he felt Jensen begin to kick him in

23    the head. (Dkt. # 76 Ex. 1 at 275.)  Burnsides attempted to get up, but Jensen continued to

24    kick and knee him in the head and torso. (*Id.*)  Burnsides finally managed to stand up and

25

26    [2]Plaintiffs lodge no evidentiary objections to Burnsides' deposition, from which the
following description of the altercation is derived. The only salient difference Plaintiffs raise
27    regarding Burnsides' account of the altercation itself is to note that Burnsides elsewhere
28    described Jensen's initial blows as being "hit[s]," rather than "kick[s]." (Dkt. # 81 at 5, 6.)

1  attempted to grab Jensen's handcuffs, but Jensen jerked them away from Burnsides' grasp.

2  (*Id.* at 276.)  Burnsides then grabbed onto Jensen and called out for help.  (*Id.*)

3  Jensen, however, spun away from Burnsides and slammed him into a wall.  (*Id.*)

4  Jensen then pushed Burnsides onto a desk and leaned down on him, preventing Burnsides

5  from getting up.  (*Id.* at 277.)  Fighting to pull away, Burnsides grabbed his Taser and

6  discharged it into Jensen's abdomen.  (*Id.*)  In Burnsides' words: "I could hear it going off.

7  I don't know.  He stiffened up for just a little bit, but then he seemed to just fight harder after

8  that.  It seemed like every time I got him with the Taser, he just fought harder."  (*Id.*)  In all,

9  Burnsides discharged the Taser four times, but Jensen continued to fight.  (*See id.* at 277-80.)

10  The two men fell to the ground, and Jensen eventually got on top of Burnsides, making it

11  difficult for him to breathe.  (*Id.*)

12  Then, Jensen grabbed for the Taser.  (*Id.* at 279.)  "[H]e pulled my wrist back.  And

13  I felt like he was breaking my fingers he was prying them off so hard, and I got real scared,

14  scared for my life."  (*Id.*)  Burnsides remembered the experience of being hit with a Taser

15  during police training: "I could hear everything going on around me, I could see everything,

16  but I was incapacitated.  I couldn't do a thing.  And I thought, I'm going to get Tased and I'm

17  going to sit there and watch him shoot me."  (*Id.*)

18  "And when he started to get my last fingers off and twisted my wrist back and started

19  yanking on the Taser, I knew I had to do something."  (*Id.*)  Burnsides un-holstered his pistol

20  and ordered Jensen to "stop fighting or I'm going to shoot."  (*Id.* at 282.)  Jensen responded

21  "Go ahead."  (*Id.*)  "I felt like he was getting control of that Taser, and he was on top of me

22  and had me pinned.  There was nothing I could do."  (*Id.* at 283.)  Burnsides fired, killing

23  Jensen.  (*See id.*)

24  A police dispatcher in another part of the station had heard Burnsides' yelling and

25  observed portions of the fight on a security camera.  (*See* Dkt. # 76 at 3-5; Dkt. # 81 at 7-9,

26  11, 13.)  She saw Jensen grabbing Burnsides, punching him, and falling down on him.  (Dkt.

27  # 76 at 3-4; Dkt. # 81 at 7-9; *see also* Dkt. # 81 Ex. 19(h) at 129.)  From her observation of

28

- 3 -

1  the fight, the dispatcher concluded that Jensen was a mortal threat to Officer Burnsides and

2  she feared for Burnsides' life.  (Dkt. # 76 at 3-4; Dkt. # 81 at 8, 11.)

3         On October 3, 2006, Plaintiffs (Jensen's parents) filed a complaint against Burnsides,

4  the City of Williams Police Department, the City of Williams, and twenty fictitious

5  individuals.[3]  (Dkt. # 2.)  Plaintiffs alleged: (1) a violation of Jensen's rights to life, liberty,

6  freedom from excessive force, and freedom from pre-conviction punishment; (2) a violation

7  of Plaintiffs' right to a familial relationship; (3) municipal liability for those violations; (4)

8  wrongful death; (5) negligent infliction of physical harm and distress; and (6) negligent

9  supervision and training.  (Dkt. # 2 at 6-11.)  On April 11, 2008, Defendants filed their

10 Motion for Judgment on the Pleadings.  (Dkt. # 72.)  On May 6, 2008, Defendants filed their

11 Motion for Summary Judgment.  (Dkt. # 75.)

12                                    **JURISDICTION**

13        The Court has federal question jurisdiction over Plaintiffs' § 1983 claims.  *See* 28

14 U.S.C. §§ 1331, 1343.  The Court has supplemental jurisdiction over Plaintiffs' related state

15 law claims.  *See* 28 U.S.C. § 1367.

16                                    **DISCUSSION**

17 **I.     Defendants' Motion for Summary Judgment**

18        **A.     Legal Standard**

19        Summary judgment is appropriate if the admissible evidence, viewed in the light most

20 favorable to the nonmoving party, "show[s] that there is no genuine issue as to any material

21 fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);

22 *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).  The moving

23 party bears the initial burden of supporting its contention that there is no genuine issue of

24 material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The burden is then on

25 the nonmoving party to establish that a genuine issue of material fact exists.  *See id.*

26

27        [3]The City of Williams Police Department has since been dismissed from this action
   by stipulation.  (*See* Dkt. # 19.)  Plaintiffs have never moved this Court to substitute any real
28 persons for the fictitious individuals named in the Complaint.

1   Substantive law determines which facts are material, and "[o]nly disputes over facts that

2   might affect the outcome of the suit . . . will properly preclude the entry of summary

3   judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Similarly, the

4   dispute must be genuine; that is, the evidence must be "such that a reasonable jury could

5   return a verdict for the nonmoving party." *Id.*

6   **B.     Analysis**

7   Defendants move for summary judgment on all of Plaintiffs' claims. (Dkt. # 75 at 5-

8   17.)  Plaintiffs' first, second, and third causes of action present federal law claims, and

9   Plaintiffs' fourth, fifth, and sixth causes of action present state law claims.  (*See* Dkt. # 2 at

10  6-11.)  Each group of claims will be addressed together.

11  **1.     Federal Claims**

12  In their Complaint, Plaintiffs alleged a violation of Jensen's and Plaintiffs' civil rights

13  as a result of Burnsides' alleged use of excessive force, as well as municipal liability for

14  those violations. (Dkt. # 2 at 6-8.) Defendants move for summary judgment on each of those

15  causes of action.  (Dkt. # 75 at 5-14.)

16  **a.     Excessive Force**

17  Both Plaintiffs and Defendants agree that Plaintiffs present a claim for excessive force

18  (*see* Dkt. # 75 at 5; Dkt. # 80 at 3) and that this claim is properly analyzed under the Fourth

19  Amendment (*see* Dkt. # 75 at 5-6; Dkt. # 80 at 3).[4] If a party moves for summary judgment

20  on an excessive force claim against a police officer, there are two separate circumstances

21  under which summary judgment would be appropriate: (1) if the officer's actions were

22  objectively reasonable, *Graham v. Connor*, 490 U.S. 386, 388 (1989); and (2) if the officer

23  has qualified immunity, *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

24

25

26      [4]Plaintiffs assert that their excessive force claims implicate the Fourteenth
    Amendment only insofar as it incorporates the Fourth Amendment against the states. (Dkt.
27  # 80 at 3.)  Thus, Plaintiffs concede that the only substantive analysis that applies is that of
28  the Fourth Amendment.

- 5 -

1       Under the objective reasonableness test, the Court must balance the nature and quality

2 of the intrusion on the subject's constitutional rights against the government's countervailing

3 interests, with "careful attention to the facts and circumstances of each particular case,

4 including the severity of the crime at issue, whether the suspect poses an immediate threat

5 to the safety of the officer[] or others, and whether he is actively resisting arrest or attempting

6 to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular

7 use of force must be judged from the perspective of a reasonable officer on the scene, rather

8 than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

9 "The calculus of reasonableness must embody allowance for the fact that police officers are

10 often forced to make split-second judgments – in circumstances that are tense, uncertain, and

11 rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.*

12 at 396-97.

13      "The qualified immunity inquiry, on the other hand, has a further dimension. . . . If

14 the officer's mistake as to what the law requires is reasonable, [then] the officer is entitled

15 to the immunity defense." *Saucier*, 533 U.S. at 205. Qualified immunity is meant "to protect

16 officers from the sometimes hazy border between excessive and acceptable force." *Id.* at 206

17 (internal quotations omitted). Courts are to "concentrate at the outset on the definition of the

18 constitutional right and to determine whether, on the facts alleged, a constitutional violation

19 could be found[.]" *Id.* at 207. Thus, the first step of the qualified immunity inquiry is a

20 determination of whether Plaintiffs can pass the objective reasonableness test. *See id.* at 200

21 ("[T]he first inquiry must be whether a constitutional right would have been violated on the

22 facts alleged[.]"). If Plaintiffs cannot pass this "threshold question," then "there is no

23 necessity for further inquiries concerning qualified immunity." *Id.* at 201.

24      Here, Plaintiffs cannot pass the objective reasonableness test for establishing the

25 violation of a constitutional right. The facts alleged, viewed in the light most favorable to

26 Plaintiffs, are functionally indistinguishable from those in *Billington v. Smith*, 292 F.3d 1177

27 (9th Cir. 2002). In *Billington*, a suspect fled from a police officer and a high-speed car chase

28 ensued. *Id.* at 1180. The suspect's car eventually crashed, and the pursuing police officer

- 6 -

1  exited his vehicle and approached the wreck, intending to render assistance and arrest the

2  suspect. *Id.* Although other officers were on the way, the officer in question was the only

3  officer at the scene. *Id.* After the officer approached the wreck, the suspect grabbed him by

4  the throat and started hitting the officer. *Id.* at 1181. The officer tried to back away, but the

5  suspect held onto him, yelling at the officer to shoot him. *Id.* The officer repeatedly struck

6  the suspect in the head with a large flashlight, to no effect. *Id.* The suspect continued to

7  punch and kick the officer as the two grappled, landing one blow that cut the officer's head

8  and knocked off his glasses. *Id.* According to the officer, the two men then began struggling

9  for the officer's firearm, and the officer felt the slide move back toward the locked position

10 (so that it could not fire). *Id.* At that point, fearing for his life, the officer moved the slide

11 forward and fired, killing the suspect. *Id.* The accounts of witnesses who observed the fight,

12 while differing in certain respects, were generally in agreement that the suspect was the

13 aggressor and was winning the fight. *Id.* at 1182.

14         The *Billington* court pointed out that "[a] police officer may reasonably use deadly

15 force where he 'has probable cause to believe that the suspect poses a threat of serious

16 physical harm, either to the officer or to others.'" *Id.* at 1184 (quoting *Tennessee v. Garner*,

17 471 U.S. 1, 11 (1985)). The court then concluded that "[u]nder the circumstances, a

18 reasonable officer would perceive a substantial risk that [the suspect] would seriously injure

19 or kill him, either by beating and kicking him, or by taking his gun and shooting him with

20 it." *Id.* at 1185. Significantly, the Ninth Circuit held that the officer's actions were

21 objectively reasonable even though there was a genuine issue of fact as to whether the men

22 were grappling over the firearm. *Id.* The Ninth Circuit so reasoned because the officer "was

23 locked in hand-to-hand combat and losing," and thus whether the men were grappling over

24 the firearm was not a "material" fact. *Id.* (quoting Fed. R. Civ. P. 56(c)). Specifically, the

25 court relied on the facts that the suspect was "the aggressor," was "actively, violently, and

26 successfully resist[ing] arrest and physically attack[ing]" the officer, and "was getting the

27 upper hand." *Id.* Thus, the court concluded that the suspect "posed an imminent threat of

28 injury or death; indeed, the threat of injury had already been realized by [the suspect's] blows

1    and kicks." *Id.* On that basis, the Ninth Circuit found summary judgment appropriate. *See*
2    *id.*

3         In this case, likewise, the only facts in the record regarding the altercation establish
4    that Officer Burnsides "was locked in hand-to-hand combat and losing." *Id.*    (*See* Dkt. #
5    86 ¶ 198.) Jensen attacked Burnsides, knocking him to the ground and striking him in the
6    head and torso. (Dkt. # 76 Ex. 1 at 274-75.)  Burnsides attempted to subdue Jensen and
7    called out for help, but no help came. (*Id.* at 276.)  Burnsides repeatedly attempted to
8    incapacitate Jensen with the Taser, but "he just fought harder." (*Id.* at 277.)  Jensen then
9    pinned Burnsides to the ground and began to pry the Taser out of his hand. (*Id.* at 279.)
10   Jensen persisted even though Burnsides un-holstered his pistol and threatened to shoot,
11   actually telling Burnsides to "go ahead." (*Id.* at 282.)  It was not until Burnsides was holding
12   onto the Taser by his "last fingers," pinned to the ground with no avenue of escape, that he
13   used deadly force. (*Id.* at 282-83.)  Like *Billington*, the only independent witness to the fight
14   (the police dispatcher) agreed that Jensen was attacking Burnsides and was a mortal threat
15   to him. (*See* Dkt. # 76 at 3-5; Dkt. # 81 at 7-9, 11, 13; *see also* Dkt. # 81 Ex. 19(h) at 129.)

16        Plaintiffs raise no evidentiary objections to any of Burnsides' testimony and offer no
17   evidence that Jensen did not attack Burnsides, that he did not strike him repeatedly, that he
18   did not pin him to the ground, and that he did not attempt to get the Taser out of his hand.
19   Plaintiffs' arguments about the timing of the intoxilyzer tests, whether Jensen's blows are
20   more properly described as "hitting" or "kicking," and whether Jensen maneuvered his hands
21   in front or whether they were cuffed in front initially are simply not relevant to the fact that
22   the two men were engaged in a physical altercation and the officer was losing.  Plaintiffs
23   point out that Jensen was "handcuffed" and "unarmed," but, even in that condition, it is
24   undisputed that he was engaged in hand-to-hand combat with the officer and had gained the
25   upper hand.  Plaintiffs point out that Jensen had been subjected to four Taser applications,
26   but, again, the evidence is undisputed that those applications, like the flashlight strikes to the
27   suspect's head in *Billington*, did not deter the decedent from assaulting the officer. *See* 292
28   F.3d at 1181.  Similarly, Plaintiffs' arguments that Burnsides "knew that backup was on the

1  way" and that his Taser was "on the safety" are undermined by the fact that the officer in

2  *Billington* also knew that backup was on the way, and also allowed his firearm to enter a

3  locked mode, but neither factor affected the Ninth Circuit's analysis. *See id.*  The undisputed

4  facts establish that Jensen posed "an immediate threat to the safety of the officer[]" and was

5  "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

6  Thus, under *Billington*, Burnsides' actions were objectively reasonable.[5]

7  Plaintiffs attempt to distinguish *Billington* in two ways.  First, Plaintiffs argue that

8  "[t]his case is distinguished from [*Billington*] in that there is no evidence that [Jensen] hit or

9  kicked Burnsides."  (Dkt. # 80 at 9.)  This argument is inexplicable given Plaintiffs'

10  subsequent admission: "Plaintiffs will concede that Burnsides' deposition testimony provides

11  that [Jensen] was kicking him in the face and in the head." (Dkt. # 81 at 5.)  Regardless, not

12  only is there evidence that Jensen physically attacked and forcefully struck Burnsides in a

13  variety of ways (Dkt. # 76 Ex. 1 at 274-83), but there is no evidence in the record to

14  contradict that evidence.  Plaintiffs' argument is therefore unavailing.

15  Second, Plaintiffs attempt to distinguish *Billington* by arguing that "the testimony is

16  uncontroverted that [Jensen] did not reach for Burnsides' gun." (Dkt. # 80 at 9.)  This is true,

17  but immaterial.  *Billington* explicitly stated that whether or not an assailant reaches for an

18  officer's firearm is not a material fact if the officer "was locked in hand-to-hand combat and

19  losing." 292 F.3d at 1185.  Under such circumstances, "a reasonable officer would perceive

20

21  [5]Plaintiffs also argue that their police expert has concluded that it was objectively
22  unreasonable to shoot Jensen. (Dkt. # 80 at 9; *see* Dkt. # 81 Ex. 7 ¶ 12.)  Defendants object
    to this evidence on a variety of grounds. (Dkt. # 86 at 6-8.)  However, as stated by the Ninth
23  Circuit in *Billington*, "for summary judgment purposes, 'the fact that an expert disagrees with
    the officer's actions does not render the officer's actions unreasonable.'"  292 F.3d at 1189
24  (quoting *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996)).  The expert
    (who, in fact, is the same expert that was involved in the *Billington* case) relies on the same
25  evidence advanced by Plaintiffs (*see* Dkt. # 81 Ex. 7 ¶ 12), and the Court has concluded that
26  none of that evidence is material to whether the officer's use of force was objectively
    reasonable under the reasoning of *Billington*.  Because the evidence would not create a
27  genuine issue of material fact even if admissible, the Court need not reach Defendants'
28  evidentiary arguments.

1    a substantial risk that [the suspect] would seriously injure or kill him, *either* by beating and

2    kicking him, *or* by taking his gun and shooting him with it." *Id.* (emphases added).  Thus,

3    Plaintiffs offer the Court no reason to find *Billington* distinguishable.

4          Having examined all of the evidence in the record, and having viewed that evidence

5    in the light most favorable to Plaintiffs, the Court finds that there is no genuine issue of

6    material fact as to the objective reasonableness of Burnsides' actions and that Defendants are

7    entitled to judgment as a matter of law.  Thus, "there is no necessity for further inquiries

8    concerning qualified immunity," *Saucier*, 533 U.S. at 201, and Defendants' Motion for

9    Summary Judgment must be granted on Plaintiffs' excessive force claims.[6]

10                    **b.    Municipal Liability**

11          Defendants move for summary judgment on Plaintiffs' claim that the City of Williams

12   is subject to liability under 42 U.S.C. § 1983.  (Dkt. # 75 at 11-14.)  Defendants spend

13   several pages discussing how the evidence in the record leaves no inference that the City

14   engaged in negligent hiring, training, and supervision, or that it ratified or tolerated the use

15   of excessive, unreasonable, and deadly force by its officers.  (Dkt. # 75 at 11-13.)  In fact,

16   Defendants break down their argument into three separate subsections based on Plaintiffs'

17   claims, with specific legal and factual argument under each.  (*See id.*)  Defendants have met

18   their initial burden of disputing whether a genuine issue of material fact exists, and thus the

19   burden is on Plaintiffs to establish such fact.  *Celotex*, 477 U.S. at 322-23.

20          Plaintiffs' response, after restating the undisputed legal standard, is this:

21                 Plaintiffs submit that there is evidence of a widespread policy
                   and custom of the City of Williams of deliberate indifference in
22                 governing its police department.  (*See* PSOF ¶¶ 23, 24, 25, 26,
                   27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 71, 72, 73, 74, 102,
23                 106, 109, 110, 111, 112, 113, 116, 118, 119, 120, 121, 122, 123,
                   124, 125, 126, 127, 128, 129, 130, 131, 160, and 165.).  This
24

25

26          [6]The Court's resolution of Plaintiffs' excessive force claims obviates any need to
     determine whether punitive damages are available against Burnsides in his individual
27   capacity, and Plaintiffs concede that they are not asserting punitive damages against the City
     of Williams.  (Dkt. # 80 at 13.)  Thus, the Court need not reach the parties' arguments about
28   punitive damages.

1
2

> wide spread [sic] practice was the moving force behind the constitutional violations perpetrated against [Jensen] by Burnsides.

3    (Dkt. # 80 at 10-11.)  That is the *entirety* of Plaintiffs' response.

4    Plaintiffs' response is insufficient to constitute an argument before this Court.  "Our

5    circuit has repeatedly admonished that we cannot manufacture arguments [for a party] . . . .

6    Rather, we review only issues which are argued *specifically and distinctly . . . .*"  *Indep.*

7    *Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (internal quotations

8    omitted and emphasis added).  Moreover, "[w]e require contentions to be accompanied by

9    *reasons.*"  *Id.* at 930 (emphasis added).  If an argument is not properly argued and explained,

10   the argument is waived.  *See, e.g.*, *id.* at 929-30 (holding that a party's argument was waived

11   because "[i]nstead of making legal arguments," the party simply made a "bold assertion" of

12   error, with "little if any analysis to assist the court in evaluating its legal challenge"); *Hibbs*

13   *v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (finding that an assertion of

14   error was "too undeveloped to be capable of assessment" and thus waived).

15   As expressed by the Ninth Circuit in *Keenan v. Allan*, this requirement is particularly

16   important in responding to a motion for summary judgment, and the failure to properly argue

17   that a genuine issue of material fact exists will not prevent a trial court from entering

18   summary judgment.  *See* 91 F.3d 1275, 1278-79 (9th Cir. 1996) (declining to scour either the

19   record or a party's briefings, which "obfuscate[d] rather than promote[d] an understanding

20   of the facts," to determine if a genuine issue of material fact existed because a court is

21   entitled to rely on "the nonmoving party to identify with reasonable particularity the evidence

22   that precludes summary judgment").  In fact, the *Keenan* court found the nonmoving party's

23   briefs deficient specifically because they "habitually list[ed] multiple citations in lieu of

24   simply stating the material facts disputed on appeal."  *Id.* at 1279.  The Ninth Circuit

25   therefore found that the nonmoving party had "failed to identify any triable issue of material

26   fact."  *Id.*

27   Here, Plaintiffs make the bold assertion that evidence supports their claim for

28   municipal liability, and then cite a string of paragraph numbers from their statement of facts

- 11 -

1    that ostensibly support that contention. (Dkt. # 80 at 10-11.) That is not an argument, much

2    less the "specific[] and distinct[]" argument that is required. *See Indep. Towers*, 350 F.3d at

3    930. Neither is Plaintiffs' contention "accompanied by reasons." *Id.* at 930. Moreover,

4    Plaintiffs' factual assertion is no more than a "list [of] multiple citations in lieu of simply

5    stating the material facts disputed," which the Ninth Circuit has found improper in opposing

6    a motion for summary judgment. *See Keenan*, 91 F.3d at 1279. Therefore, Plaintiffs have

7    "failed to identify any triable issue of material fact," *id.*, and Defendants' motion must be

8    granted.

9          However, even if Plaintiffs' assertion could be termed an acceptable argument,

10   summary judgment would still be appropriate because none of the citations to which

11   Plaintiffs refer raise a genuine issue of material fact on Plaintiffs' claim for municipal

12   liability under § 1983. "[A] municipality can be found liable under § 1983 only where the

13   municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489

14   U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)).

15   To succeed on a § 1983 cause of action against a municipality, Plaintiffs must show that a

16   policy, practice, or custom of the municipality permitted the alleged constitutional violation

17   to occur. *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). However:

18              [I]t is not enough for a § 1983 plaintiff merely to identify
               conduct properly attributable to the municipality. The plaintiff
19             must also demonstrate that, through its *deliberate* conduct, the
               municipality was the "moving force" behind the injury alleged.
20             That is, a plaintiff must show that the municipal action was
               taken with the requisite degree of culpability and must
21             demonstrate a direct causal link between the municipal action
               and the deprivation of federal rights.

22
     *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). "Where a plaintiff claims that
23
     the municipality has not directly inflicted an injury, but nonetheless has caused an employee
24
     to do so, rigorous standards of culpability and causation must be applied to ensure that the
25
     municipality is not held liable solely for the actions of its employee." *Id.* at 405. There is
26
     no issue for trial unless there is sufficient evidence favoring the nonmoving party; if the
27

28

- 12 -

1  evidence is merely colorable or is not significantly probative, summary judgment may be

2  granted.  *Anderson*, 477 U.S. at 249-50.

3  Here, the paragraphs to which Plaintiffs refer contain no evidence of a "direct causal

4  link between the municipal action and the deprivation of federal rights."[7]  *Brown*, 520 U.S.

5  at 404.  Paragraphs 23-31 merely contain procedural facts about who occupied the position

6  of police chief at any given time.  (*See* Dkt. # 81 ¶¶ 23-31.)  Paragraphs 32-38 contain the

7  opinion of a single police officer that he and other officers were stressed about the

8  administrative setup of the police department.  (*See* Dkt. # 81 ¶¶ 32-38.)  There is no

9  evidence, however, that any such stress caused Burnsides' actions.  While there is evidence

10  that Burnsides reported being stressed on January 22 (*see* Dkt. # 81 ¶ 74), there is no

11  evidence that any such stress caused his actions on the day of the incident two weeks later.

12  Paragraphs 71-74, 102, and 106 refer to the deposition of a police supervisor who wrote in

13  a memo, as Plaintiffs put it, that "the integrity of the Williams Police Department had been

14  jeopardized" by its relationship with the City of Williams.  Again, there are no facts

15  suggesting that Burnsides' actions on the day in question were in any way caused by the

16  relationship between the City and its police department.  Paragraphs 109-31 involve the

17  deposition of an interim administrative chief, who testified that he discussed the contents of

18  the supervisor's memo with the supervisor.  (*See* Dkt. # 81 ¶¶ 109-31.)  Just as the

19  supervisor's own testimony does not make any allegations causally related to the incident,

20  the administrative chief's recapitulation of that testimony does not raise any facts linking

21  municipal action or inaction to a deprivation of Jensen's and Plaintiffs' constitutional rights.

22  Finally, Paragraphs 160 and 165 discuss Burnsides' complaints about the administrative

23  chief.  They too do not state any facts linking the City's actions and Jensen's death, much

24  less facts of sufficient causality so as to survive summary judgment.

25

26

27  [7]As above, the Court need not resolve Defendants' evidentiary objections to these
asserted facts because, even if admissible, they would not raise facts sufficient to survive
28  summary judgment.

1       In short, none of Plaintiffs' citations raise evidence implicating a "direct causal link

2 between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404.

3 Even if the facts to which Plaintiffs refer could be interpreted as raising a colorable inference

4 of municipal liability, that would not satisfy the "rigorous standards of culpability and

5 causation [that] must be applied to ensure that the municipality is not held liable solely for

6 the actions of its employee." *Id.* at 405; *see Anderson*, 477 U.S. at 249-50.   Therefore,

7 summary judgment is appropriate on Plaintiffs' claim for municipal liability.

8       Thus, the Court grants summary judgment to Defendants on all of Plaintiffs' federal

9 law claims.

10              **2.**     **State Claims**

11       Defendants also move for summary judgment on Plaintiffs' state law claims.

12 However, because the Court has entered summary judgment on Plaintiffs' federal law claims,

13 the original basis for federal jurisdiction over this case no longer exists.  In this situation, the

14 Court has the discretion either to retain jurisdiction over the case or to dismiss the case so

15 that it may proceed in state court. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th

16 Cir. 1997) ("[A] federal district court with power to hear state law claims has discretion to

17 keep, or decline to keep, them under the conditions set out in § 1367(c) . . . . That state law

18 claims *should* be dismissed if federal claims are dismissed before trial has never meant that

19 they *must* be dismissed.") (internal citations and quotations omitted).   That decision is

20 informed by the values of "economy, convenience, fairness, and comity."  *Id.* at 1001

21 (internal quotations omitted).  The United States Supreme Court has held that "in the usual

22 case in which all federal-law claims are eliminated before trial, the balance of factors . . . will

23 point toward declining to exercise jurisdiction over the remaining state-law claims."

24 *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

25       In this case, the balance of factors counsel that the Court should decline to exercise

26 jurisdiction over the remaining state law claims.  This case is still at a sufficiently early stage

27 such that little, if any,  judicial economy will be lost in declining jurisdiction, and it will

28 certainly be as convenient and fair to the parties to litigate the state law claims in state court.

1 Moreover, as several of the issues in this case may require interpretation of Arizona law, the

2 Arizona courts have a vested interest in interpreting and applying state law themselves.

3 Therefore, the Court declines to exercise jurisdiction over Plaintiff's state law claims.

4 Plaintiffs are free to refile their state law claims in state court.

5      Because the Court no longer has jurisdiction over Plaintiffs' state law claims,

6 Defendants' Motion for Summary Judgment on those claims is denied as moot.

7 **II.      Defendants' Motion for Judgment on the Pleadings**

8      Defendants' Motion for Judgment on the Pleadings likewise involves only Plaintiffs'

9 state law claims.   Because the Court no longer has jurisdiction over those claims,

10 Defendants' Motion for Judgment on the Pleadings is denied as moot.

11 **CONCLUSION**

12      Plaintiffs have failed to raise any genuine issue of material fact that would prevent

13 entry of summary judgment on their federal law claims, and the Court declines to exercise

14 jurisdiction over the remaining state law claims.

15      **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Dkt.

16 # 75) is **GRANTED IN PART** and **DENIED IN PART**.

17      **IT IS FURTHER ORDERED** that Defendants' Motion for Judgment on the

18 Pleadings (Dkt. # 72) is **DENIED AS MOOT**.

19      **IT IS FURTHER ORDERED** directing the Clerk of the Court to **terminate** this

20 action.

21      DATED this 22nd day of October, 2008.

22

23

24

25

26         *G. Murray Snow*
                _____

27                   G. Murray Snow
               United States District Judge

28